## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

N. ALBERT BACHARACH JR., on behalf of himself and
all other persons similarly situated,

|                    |                            |
|--------------------|----------------------------|
| Plaintiff,         | CASE NO.:                  |
| vs.                | DIVISION:                  |
|                    |                            |
|                    | CLASS REPRESENTATION       |

A-S MEDICATION SOLUTIONS LLC;
ACTAVIS, LLC;
ACTAVIS PHARMA, INC.;
ARROW PHARMA MALTA LTD.;
AUROBINDO;
AUROBINDO PHARMA USA;
AVKARE, INC.;
CAMBER PHARMACEUTICALS, INC.
GOLDEN STATE MEDICAL SUPPLY, INC.;
HETERO DRUGS, LIMITED
HETERO LABS LTD.;
HETERO USA INC.
HUAHAI U.S. INC.;
NORTHWIND PHARMACEUTICALS, LLC;
PRINSTON PHARMACEUTICALS INC.;
SCIEGEN PHARMACEUTICALS;
SOLCO HEALTHCARE US, LLC;
TEVA PHARMACEUTICALS INDUSTRIES LTD.
TEVA PHARMACEUTICALS USA, INC.;
WESTMINSTER PHARMACEUTICALS.; and
ZHEJIANG HUAHAI PHARMACEUTICAL CO., LTD.,

Defendants.

_____/

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff, N. ALBERT BACHARACH  ("Plaintiff"), on behalf of itself

and classes of all other  purchasers similarly situated, complains against A- S Medication

Solutions LLC; Actavis, LLC; Actavis Pharma, Inc.; Actavis Pharma Malta, Ltd.; Aurobindo;

Aurobindo Pharma USA; AvKare, Inc.; Camber Pharmaceuticals, Inc.; Golden State Medical

Supply, Inc.; Hetero Drugs, Limited; Hetero Labs Ltd.; Hetero USA Inc.; Huahai U.S. Inc.;

Northwind Pharmaceuticals, LLC; Prinston Pharmaceuticals Inc.; Sciegen Pharmaceuticals;

Solco Healthcare US, LLC; Teva Pharmaceutical Industries Ltd.; Teva Pharmaceuticals USA,

Inc.; Westminster Pharmaceuticals; Zhejiang Huahai Pharmaceutical Co., Ltd. as follows:

## I.      INTRODUCTION

1.  Plaintiff, individually, and on behalf of others similarly situated bring this Complaint
    which arises from Plaintiff's purchase of an adulterated, misbranded, and unapproved
    medication designed, manufactured, marketed, distributed, packaged, and sold by
    Defendants.

2.  This case arises from adulterated, misbranded, and unapproved Irbesartan-containing
    drugs ("ICDs") that were designed, manufactured, marketed, distributed, packaged, and
    sold by Defendants in the United States, and which have been and remain the subject of
    one of the largest ongoing contaminated drug recalls ever in the United States.

3.  The ICDs at issue in this litigation contained impurities, including, but not limited to, N-
    Nitroso-dimethylamine (NDMA), N-Nitrosodiethylamine (NDEA), or other nitrosamine
    compounds.

4.  Irbesartan is the generic version of the registered listed drug ("RLD") Avapro®
    ("Avapro"). This RLD is indicated for, among other things, the treatment of high blood
    pressure, a condition affecting approximately 103 million Americans according to the

American Heart Association.[1] Several million U.S. patients pay for (in whole or in part) and consume generic Irbesartan each year.

5.   At all times during the period alleged herein, Defendants represented and warranted to consumers that their ICDs were therapeutically equivalent to and otherwise the same as the their RLD, were otherwise fit for their ordinary uses, and were otherwise manufactured and distributed in accordance with applicable laws and regulations.

6.   According to the Food and Drug Administration's ("FDA") testing, Defendants' generic ICDs contained NDMA and/or NDEA. The FDA has yet to release testing results for other impurities such as N-Nitroso-N-methyl-4-aminobutyric acid ("NMBA").

7.   Upon information and belief, the contamination of Defendants' ICDs began in or around 2011 and Defendants had actual and constructive notice of the contamination around that same time.

8.   For years, Defendants willfully ignored warnings signs regarding the operating standards at several of the overseas manufacturing plants where Defendants' generic ICDs were manufactured for import to the United States, and knowingly and fraudulently manufactured, sold, labeled, marketed, and/or distributed contaminated, adulterated, and/or misbranded ICDs for consumption in the United States.

9.   In this class action, Plaintiff, on behalf of itself and classes of similarly situated consumers, requests an award of compensatory damages, punitive damages, interest, attorneys' fees, court costs, and such other relief as may be just and proper, arising from the presence of unsafe and illegal levels of NDMA and/or NDEA in certain lots of ICDs

---

[1] https://www.heart.org/en/news/2018/05/01/more-than-100-million-americans-have-high-blood-pressure-aha-says

sold in the United States and paid for in whole or part by Plaintiff and classes of similarly situated consumers.

## II.     PARTIES

10. Plaintiff, N. Albert Bacharach Jr., at all times material hereto, was prescribed, purchased and consumed the contaminated ICD.

11. Zhejiang Huahai Pharmaceutical Co., Ltd. Entities

   a.  Defendant Zhejiang Huahai Pharmaceutical Co., Ltd. ("ZHP") is a Chinese corporation, with its principal place of business at Xunqiao, Linhai, Zhejiang 317024, China. The company also has a United States headquarters located at 2009 and 2002 Eastpark Blvd., Cranbury, NJ 08512. ZHP on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. At all times material to this action, ZHP has been engaged in the manufacturing, sale, and distribution of contaminated, adulterated, and/or misbranded generic ICDs throughout the United States.

   b.  Defendant Huahai US Inc. ("Huahai US") is a New Jersey corporation, with its principal place of business located at 2002 Eastpark Blvd., Cranbury, New Jersey 08512. Huahai US is the wholly owned subsidiary of ZHP. Huahai US "focus[es] on the sales and marketing of [ZHP's] APIs[2] and Intermediates."[3] At all times material to this case, Huahai US has been engaged in the manufacture, sale, and distribution of contaminated, adulterated, and/or misbranded generic ICDs in the United States.

---

[2] API means "active pharmaceutical ingredients."
[3] https://www.huahaius.com/index.html

c.   Defendant Prinston Pharmaceutical Inc. d/b/a Solco Healthcare LLC ("Prinston") is a Delaware corporation with its principal place of business located at 2002 Eastpark Blvd., Cranbury, New Jersey 08512. Defendant Prinston is a majority-owned subsidiary of ZHP. At all times material to this case, Prinston has been engaged in the manufacturing, sale, and distribution of contaminated, adulterated, and/or misbranded generic ICDs in the United States.

d.   Defendant Solco Healthcare US, LLC ("Solco") is a Delaware limited liability company with its principal place of business located at 2002 Eastpark Blvd., Cranbury, New Jersey 08512. Solco is a wholly owned subsidiary of Prinston and ZHP. At all times material to this case, Solco has been engaged in the manufacturing, sale, and distribution of contaminated, adulterated, and/or misbranded generic ICDs in the United States.

e.   Collectively, ZHP, Huahai US, Prinston, and Solco will be referred to as the ZHP Defendants in this Complaint. Much of the ICDs manufactured by the ZHP Defendants contains NDMA levels hundreds of times higher than acceptable limits for human consumption, according to laboratory results published by the FDA. Some of its ICDs also contained NDEA.

f.   The ZHP Defendants also manufactured Irbesartan -containing API for other finished-dose manufacturers: Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc., and Torrent Pharmaceuticals, Ltd. In turn, the finished-dose manufacturer defendants' ICDs have unique labelers/distributors, as well as repackagers.

12.  Teva Pharmaceutical Industries Ltd. Entities

5

a.   Defendant, Teva Pharmaceutical Industries Ltd. ("Teva"), is a foreign company incorporated and headquartered in Petah Tikvah, Israel. Teva on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. At all times material to this case, Teva has been engaged in the manufacturing, sale, and distribution of contaminated, adulterated, and/or misbranded generic ICDs in the United States.

b.   Defendant, Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation, with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054, and is a wholly owned subsidiary of Teva. Teva provide(s) "a full spectrum of products from generics, API and over the counter to specialty and biologics." [4] At all times material to this case, Teva USA has been engaged in the manufacturing, sale, and distribution of contaminated, adulterated, and/or misbranded generic ICDs in the United States.

c.   Actavis, LLC ("Actavis") is a Delaware corporation with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054. Actavis is a wholly owned subsidiary of Teva. At all times material to this case, Actavis has been engaged in the manufacturing, sale, and distribution of contaminated, adulterated, and/or misbranded generic ICDs in the United States, including in the State of New Jersey.

d.   Arrow Pharma Malta Ltd. ("Arrow") is a foreign corporation headquartered at HF62 HalFar Industrial Estate, HalFar, BBG 300, Malta. Teva owns the entirety of Arrow, which on its own and/or through its parent company and subsidiaries

---

[4] https://www.tevausa.com/About-Teva/article-pages/facts-and-figures/

regularly conducts business throughout the United States of America and its territories and possessions. At all times material to this case, Arrow has been engaged in the manufacturing, sale, and distribution of contaminated, adulterated, and/or misbranded ICDs in the United States.

e.  Actavis Pharma, Inc. ("Actavis Pharma") is a Delaware corporation with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054, and is Teva's wholly owned subsidiary. At all times material to this case, Actavis Pharma has been engaged in the manufacturing, sale, and distribution of contaminated, adulterated, and/or misbranded ICDs in the United States.

f.  Collectively, Teva, Teva USA, Arrow, Actavis and Actavis Pharma will be referred to as the Teva Defendants in this Complaint. The Irbesartan-containing API manufactured by Teva was distributed to Teva's subsidiaries or affiliates including Teva USA and Actavis.

13. Defendant A-S Medication Solutions LLC ("A-S Medications") is a limited liability company organized under the laws of the State of Nebraska, with its principal place of business at 224 North Park Avenue, Fremont, Nebraska. Teva used the adulterated ICDs, in turn, A-S Medications at all times material to this case, A-S Medications has been engaged in the manufacturing, sale, and distribution of contaminated, adulterated, and/or misbranded ICDs in the United States.

14. Hetero Drugs Limited Entities

a.  Defendant Hetero Drugs, Limited ("Hetero") is a foreign corporation, with its principal place of business at 7-2-A2, Hetero Corporate, Industrial Estates, Sanath Nagar, Hyderabad - 500 018, Telangana, India. "Hetero has a strong established

global presence with 36 manufacturing facilities and a robust network of business partners and marketing offices strategically located across the world." Hetero on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. At all times material to this action, Hetero has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded and/or misbranded generic ICDs throughout the United States.

b. Defendant Hetero USA Inc. ("Hetero USA") is "the US representation of HETERO, a privately owned; researched based global pharmaceutical company." Hetero USA is a Delaware corporation with its principal place of business located at 1035 Centennial Avenue, Piscataway, New Jersey 08854. Hetero USA is the wholly owned subsidiary of Hetero. At all times material to this action, Hetero USA has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

c. Defendant Hetero Labs Ltd. ("Hetero Labs") is a foreign corporation, with its principal place of business at 7-2-A2, Hetero Corporate, Industrial Estates, Sanath Nagar, Hyderabad – 500 018, Telangana, India. Hetero Labs on its own and/or through its subsidiaries regularly conducts business in New Jersey and throughout the United States and its territories and possessions. Hetero Labs is the wholly owned subsidiary of Hetero. At all times material to this action, Hetero Labs has been engaged in the manufacturing, sale, and distribution of adulterated and/or misbranded and/or misbranded generic ICDs throughout the United States.

     d.  Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation, with its principal place of business at 1031 Centennial Avenue, Piscataway, NJ 088454. Camber is the wholly owned subsidiary of Hetero Drugs. At all times material to this case, Camber has been engaged in manufacturing, sale, and distribution of adulterated, misbranded, and/or unapproved ICDs throughout the United States.

15. Collectively, Hetero Labs, Hetero, Hetero USA, and Camber will be referred to as the Hetero Defendants in this Complaint. The Irbesartan-containing API manufactured by Hetero was distributed to Hetero's U.S. subsidiaries or affiliates including Hetero USA and Camber.

16. Defendant AvKare, Inc. ("AvKare") is a corporation organized under the laws of the State of Tennessee with a principal place of business at 615 North 1st Street, Pulaski, Tennessee. At all times material to this case, AvKare has been engaged in manufacturing, sale, and distribution of adulterated, misbranded, and/or unapproved ICDs throughout the United States.

17. Defendant Northwind Pharmaceuticals, LLC ("Northwind") is a limited liability company organized under the laws of the State of Indiana with its principal place of business at 9402 Uptown Drive, Suite 1100, Indianapolis, IN, 46256. At all times material to this case, Northwind has been engaged in manufacturing, sale, and distribution of adulterated, misbranded, and/or unapproved ICDs throughout the United States.

18. Aurobindo Entities

a.  Defendant Aurobindo is an Indian corporation, with its principal place of business in Hitech City, Hyderabad, India organized and existing under the laws of the Republic of India. The company also has a United States headquarters through Aurobindo Pharma USA Inc., located at in East Windsor, New Jersey. Aurobindo on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. At all times material to this case, Aurobindo has been engaged in the manufacturing, sale, and distribution of contaminated, adulterated, and/or misbranded generic ICDs throughout the United States.

b.  Defendant Aurobindo Pharma USA Inc. is a company, with its principal place of business located at 279 Princeton Hightstown Road East Windsor, NJ 08520. Aurobindo Pharma USA Inc. is the wholly owned subsidiary of Aurobindo. "Aurobindo Pharma Limited is voluntarily recalling 22 Batches of the drug substance Irbesartan due to the presence of an impurity, N-nitrosodiethylamine (NDEA)".[5] At all times material to this case, Aurobindo Pharma USA Inc. has been engaged in the manufacture, sale, and distribution of contaminated, adulterated, and/or misbranded generic ICDs in the United States.

c.  Collectively Aurobindo and Aurobindo Pharma USA Inc. will be referred to as the Aurobindo Defendants in this Complaint. Aurobindo supplies active pharmaceutical ingredients ("API"), including irbesartan API, to United States manufacturers, who in turn produce finished product, with the expectation and actual knowledge that its API will be purchased and/or used in other drug

---

[5] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/aurobindo-pharma-limited-issues-voluntary-recall-irbesartan-drug-substance-due-detection-trace

products purchased throughout the United States, including within the State of
Florida and within this District.

19. Defendant ScieGen Pharmaceuticals, Inc. ("ScieGen") is a corporation organized under
the laws of the State of New York with a principal place of business at 89 Arkay Drive,
Hauppauge, New York, 11788. The FDA announced, "ScieGen Pharmaceuticals, Inc. is
voluntarily recalling listed lots, within expiry, of Irbesartan Tablets, USP 75 mg, 150 mg,
and 300 mg dosage forms to the consumer level. These products are being recalled due to
the presence of an impurity, N-nitrosodiethylamine (NDEA) contained in the API
Irbesartan, USP manufactured by Aurobindo Pharma Limited". [6] At all times material to
this case, ScieGen has been engaged in the manufacturing, sale, and distribution of
contaminated, adulterated, and/or misbranded generic ICDs throughout the United States.

20. Defendant Westminster Pharmaceuticals is a limited liability company organized under
the laws of the State of Delaware, with its principal place of business has a corporate
office in 3810 Northdale Blvd Ste. 250 Tampa, Florida 33624. At all times material to
this case, Westminster has been engaged in the manufacturing, sale, and distribution of
contaminated, adulterated, and/or misbranded generic ICDs throughout United States.

21. Defendant Golden State Medical Supply (GSMS), Inc. is a company organized under the
laws of the State of California, with its principal place of business located at 5187
Camino Ruiz Camarillo, CA 93012. ScieGen supplied the ICDs to both Westminster and
GSMS. At all times material to this case, GSMS has been engaged in the manufacturing,
sale, and distribution of contaminated, adulterated, and/or misbranded generic ICDs
throughout United States.

---

[6] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/sciegen-pharmaceuticals-inc-issues-voluntary-nationwide-recall-irbesartan-tablets-usp-75-mg-150-mg

### III.    JURISDICTION AND VENUE

22.  This Court has jurisdiction over this action pursuant § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Classes, as defined below (the "National Class" and the "Florida Class"), is a citizen of a different state than Defendants, there are more than 100 members of the Classes, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

23. At all times relevant Defendants purposefully directed their business activities at the State of Florida and purposefully availed themselves of the privilege of conducting business in Florida.

24. At all times relevant Defendants each benefitted from Florida's system of laws, infrastructure and business climate for the sale of their products, including prescription irbesartan.

25. On information and belief, Defendants' manufacture, marketing, distribution and/or sale of ICDs resulted in millions of dollars in profits to Defendants. Defendants' profits are a direct result of their selection of Florida to conduct business.

26. The court has personal jurisdiction over Defendants because at all relevant times they have engaged in substantial business activities in the State of Florida. At all relevant times Defendants transacted, solicited, and conducted business in Florida through their employees, agents, and/or sales representatives, and Florida substantial revenue from such business in Florida.

27. Defendants are each subject to specific personal jurisdiction in this District pursuant to § 48.193, Fla. Stat. (2018) because Plaintiff's claims arise from Defendants' respective actions in (a) conducting and engaging in business in the State of Florida

[§48.193(1)(a)(1)], and Defendants' commission of tortious acts in the State of Florida [§48.193(1)(a)(2)].

28. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the conduct, events, transactions, and claims occurred in this District. Plaintiff's causes of action arise out of Defendants' contacts and activities within Florida and within this District. Defendants transact substantial business in this District and earned substantial compensation and profits from sales of the NDMA-contaminated Irbesartan at issue in this Complaint within this District.

## IV.   FACTUAL ALLEGATIONS

### A.  The Irbesartan-Containing Drugs

29. The medication in question in this case is a drug that Defendants marketed and sold under the name "Irbesartan."

30. Irbesartan is a generic version of the brand-name medication, Avapro.

31. Irbesartan is used to treat high blood pressure and heart failure, and to improve a patient's chances of living longer after a heart attack.

32. Irbesartan is classified as an angiotensin receptor blocker (ARB) that is selective for the type II angiotensin receptor. It works by relaxing blood vessels so that blood can flow more easily, thereby lowering blood pressure.

33. The patents for Avapro expired in 2011.[7]

34. Shortly after the patent for Avapro expired, the FDA began to approve generic versions of the drug.

35. NDMA N-nitrosodimethlyamine, commonly known as NDMA, is an odorless, yellow liquid.[8]

---

[7] https://www.uspharmacist.com/article/drug-patent-expirations-and-the-patent-cliff

36. According to the U.S. Environmental Protection Agency, "NDMA is a semi volatile chemical that forms in both industrial and natural processes."[9]

37. NDMA can be unintentionally produced in and released from industrial sources through chemical reactions involving other chemicals called alkylamines.

38. The American Conference of Governmental Industrial Hygienists classifies NDMA as a confirmed animal carcinogen.[10]

39. The US Department of Health and Human Services (DHHS) similarly states that NDMA is reasonably anticipated to be a human carcinogen.[11] This classification is based upon DHHS's findings that NDMA caused tumors in numerous species of experimental animals, at several different tissue sites, and by several routes of exposure, with tumors occurring primarily in the liver, respiratory tract, kidney, and blood vessels.[12]

40. Exposure to NDMA can occur through ingestion of food, water, or medication containing nitrosamines.[13]

41. Exposure to high levels of NDMA has been linked to reduced kidney function.[14]

42. NDEA N-Nitrosodiethylamine, often referred to as NDEA, is a yellow, oily liquid that is very soluble in water.[15]

43. Like NDMA, NDEA is also classified as a probable human carcinogen and a known animal carcinogen.[16]

---

[8] https://www.atsdr.cdc.gov/toxprofiles/tp141.pdf
[9] https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] https://www.epa.gov/sites/production/files/2016-09/documents/n-nitrosodimethylamine.pdf

44. NDEA is an even more potent carcinogen than NDMA.

45. According to the U.S. Environmental Protection Agency, animal studies have demonstrated that chronic ingestion of NDEA can cause liver and kidney tumors and other types of tumors as well.

46. Hematological effects were also reported in animal studies.[17]

47. Tests conducted on rats, mice, and hamsters demonstrated that NDEA has high to extreme toxicity from oral exposure.[18]

48. The New Jersey Department of Health notes that NDEA "should be handled as a CARCINOGEN and MUTAGEN – WITH EXTREME CAUTION."[19]

49. The New Jersey Department of Health also states that "[t]here may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level."[20]

**B.  Formation of Nitrosamines in the Subject Drugs**

50. NDMA and NDEA are both considered genotoxic compounds, as they both contain nitroso groups, which are gene-mutating groups.[21]

51. Upon information and belief, the reason Defendants' manufacturing process produced these compounds is linked to the tetrazole group that most ARB drugs have. Solvents used to produce the tetrazole ring, such as N-Dimethylformamide (DMF), can result in

---

[16] https://www.fda.gov/Drugs/DrugSafety/ucm613916.htm
[17] https://www.epa.gov/sites/production/files/2016-09/documents/n-nitrosodimethylamine.pdf
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] https://www.pharmaceuticalonline.com/doc/nitroso-impurities-in-valsartan-how-did-we-miss-them-0001

the formation of drug impurities or new active ingredients, such as NDMA and NDEA, as a byproduct of the chemical reactions.20[22]

52. The pharmaceutical industry has been aware of the potential for the formation of nitrosamines in pharmaceutical drugs at least as far back as 2005.[23]

**C. Recalls**

53. Upon information and belief, Plaintiff states that the presence of NDMA and NDEA in the ICDs is due to a manufacturing change that took place on or around 2012.[24]

54. On or about July 13, 2018, the Food and Drug Administration ("FDA) announced a voluntary recall of several brands of generic medications after finding NDMA in the recalled products. The products subject to this recall were some of those which contained the API supplied by Zhejiang Huahai Pharmaceuticals, a manufacturer in China.[25]

55. In or around October, 2018 The FDA noticed a voluntary recall of 22 batches of ICDs due to the presence of NDEA.[26]

56. The FDA has stated that certain companies were recalling "all lots of non-expired products that contain the ingredient valsartan[27] supplied to them by Zhejiang Huahai Pharmaceuticals Linhai, China."[28]

57. On or about October 5, 2018, FDA posted the results of some testing conducted on samples on other angiotensin receptor blockers. Noting that "consuming up to 0.096

---

[22] *Id*.
[23] http://www.pharma.gally.ch/UserFiles/File/proofs%20of%20article.pdf
[24] https://healthycanadians.gc.ca/recall-alert-rappel-avis/hc-sc/2018/67552a-eng.php
[25] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm613532.htm
[26] https://www.drugs.com/fda-alerts/1383-817.html
[27] Valsartan is another angiotensin receptor blocker (ARB), also alleged to have been manufactured, marketed, distributed and sold by Defendants, containing the same contaminant.
[28] https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-several-medicinescontaining-valsartan-following-detection-impurity

micrograms of NDMA per day is considered reasonably safe for human ingestion based on lifetime exposure," the results of the testing showed levels ranging from 0.3 micrograms up to 17 micrograms.[29] Thus, the pills contained somewhere between 3.1 and 177 times the level of NDMA deemed safe for human consumption. Subsequent testing revealed levels as high as 20 micrograms, which is 208.3 times the safe level. By way of comparison, NDMA is sometimes also found in water and foods, including meats, dairy products, and vegetables. The U.S. Health Department set strict limits on the amount of NDMA that is permitted in each category of food, but these limits are dwarfed by the amount of NDMA present in the samples of the valsartan-containing medications referenced above. For example, cured meat is estimated to contain between 0.004 and 0.23 micrograms of NDMA.[30]

58. Over the course of the fall and winter of 2018, NDMA and NDEA continued to be detected across so many brands of ARB drugs that the FDA imposed interim limits for NDMA and NDEA in ARBs to prevent drug shortages. In doing so, FDA reminded "manufacturers that they are responsible for developing and using suitable methods to detect impurities, including when they make changes to their manufacturing processes. If a manufacturer detects a new impurity or high level of impurities, they should fully evaluate the impurities and take action to ensure the product is safe for patients."[31]

59. Plaintiff, N. Albert Bacharach, was prescribed, purchased, and ingested Irbesartan which was subject to recalls.

## V.    THE FEDERAL REGULATORY LANDSCAPE

---

[29] https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products
[30] https://www.fda.gov/Drugs/DrugSafety/ucm613916.htm
[31] *Id.*

**A.   The Generic Medication is Supposed to be Chemically the Same as a Brand Name.**

60.  According to FDA, "[a] generic drug is a medication created to be the same as an already marketed brand-name drug in dosage form, safety, strength, route of administration, quality, performance characteristics, and intended use. These similarities help to demonstrate bioequivalence, which means that a generic medicine works in the same way and provides the same clinical benefit as its brand-name version. In other words, you can take a generic medicine as an equal substitute for its brand-name counterpart."[32]

61. While brand-name medications undergo a more rigorous review before being approved, generic manufacturers are permitted to submit an abbreviated new drug application (ANDA), which only requires a generic manufacturer to demonstrate that the generic medicine is the same as the brand name version in the following ways:

   a.   The active ingredient in the generic medicine is the same as in the brand name drug/ innovator drug.

   b.   The generic medicine has the same strength, use indications, form (such a tablet or an injectable), and route of administration (such as oral or topical).

   c.   The inactive ingredients of the generic medicine are acceptable.

   d.   The generic medicine is manufactured under the same strict standards as the brand-name medicine.

   e.   The container in which the medicine will be shipped and sold is appropriate, and the label is the same as the brand-name medicine's label.[33]

62. The subject drugs ingested by Plaintiff, were approved by the FDA, which assumed, based upon Defendants' representations, that these drugs met the above criteria.

---

[32] https://www.fda.gov/drugs/questions-answers/generic-drugs-questions-answers
[33] https://www.fda.gov/drugs/generic-drugs/generic-drug-facts

63. ANDA applications do not require drug manufacturers to repeat animal studies or clinical research on ingredients or dosage forms already approved for safety and effectiveness.[34]

64. Further, because generic drugs are supposed to be nearly identical to their brandname counterparts, they are also supposed to have the same risks and benefits.[35]

**B. Misbranded and Adulterated Drugs**

65. The manufacture of any misbranded or adulterated drug is prohibited under federal law.[36]

66. The introduction into commerce of any misbranded or adulterated drug is similarly prohibited.[37]

67. Similarly, the receipt in interstate commerce of any adulterated or misbranded drug is also unlawful.[38]

68. A drug is adulterated:

    a. "if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health;"[39]

    b. "if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice…as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess;"[40]

---

[34] https://www.fda.gov/drugs/questions-answers/generic-drugs-questions-answers
[35] *Id.*
[36] 21 U.S.C. § 331(g).
[37] 21 U.S.C. § 331(a).
[38] 21 U.S.C. § 331(c).
[39] 21 U.S.C. § 351(a)(2)(A).
[40] 21 U.S.C. § 351(a)(2)(B).

c.   c. "If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and … its quality or purity falls below, the standard set forth in such compendium. … No drug defined in an official compendium shall be deemed to be adulterated under this paragraph because it differs from the standard of strength, quality, or purity therefor set forth in such compendium, if its difference in strength, quality, or purity from such standard is plainly stated on its label."[41]

d.   "If it is a drug and any substance has been (1) mixed or packed therewith so as to reduce its quality or strength or (2) substituted wholly or in part therefor."[42]

69. A drug is misbranded:

a.   "If its labeling is false or misleading in any particular."[43]

b.   "If any word, statement, or other information required…to appear on the label or labeling is not prominently placed thereon…in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use."[44]

c.   "If the labeling does not contain, among other things, "the proportion of each active ingredient…"[45]

d.   "Unless its labeling bears (1) adequate directions for use; and (2) such adequate warnings … against unsafe dosage or methods or duration of administration or

---

[41] 21 U.S.C. § 351(b).
[42] 21 U.S.C. § 351(d).
[43] 21 U.S.C. § 352(a)(1).
[44] 21 U.S.C. § 352(c).
[45] 21 U.S.C. § 352(e)(1)(A)(ii).

application, in such manner and form, as are necessary for the protection of users, …"[46]

e.  "If it purports to be a drug the name of which is recognized in an official compendium, unless it is packaged and labeled as prescribed therein."[47]

f.  "if it is an imitation of another drug;"[48]

g.  "if it is offered for sale under the name of another drug."[49]

h.  "If it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."[50]

i.  If the drug is advertised incorrectly in any manner;[51] or

j.   If the drug's "packaging or labeling is in violation of an applicable regulation…"[52]

70. As articulated in this Complaint, Defendants' unapproved ICDs were misbranded and adulterated in violation of all of the above-cited reasons.

## C.  The Drug Ingested by Plaintiff Was Not Irbesartan, But a New, Unapproved, Irbesartan-Containing Drug

71. The FDA's website provides the definition for a drug:

The Federal Food Drug and Cosmetic Act (FD&C Act) and FDA regulations define the term drug, in part, by reference to its intended use, as "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease" and "articles (other than food) intended to affect the structure or any function of the

---

[46] 21 U.S.C. § 352(f).
[47] 21 U.S.C. § 352(g).
[48] 21 U.S.C. § 352(i)(2).
[49] 21 U.S.C. § 352(i)(3).
[50] 21 U.S.C. § 352(j).
[51] 21 U.S.C. § 352(n).
[52] 21 U.S.C. § 352(p).

21

body of man or other animals." Therefore, almost any ingested or topical or injectable product that, through its label or labeling (including internet websites, promotional pamphlets, and other marketing material), is claimed to be beneficial for such uses will be regulated by FDA as a drug. The definition also includes components of drugs, such as active pharmaceutical ingredients.[53]

72. 21 C.F.R. § 210.3(b)(7) defines an "active ingredient" in a drug as "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of man or other animals. The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect."[54]

73. NDMA and NDEA both have the ability to cause cancer and/or other serious illnesses or diseases by triggering genetic mutations in humans. This mutation affects the structure of the human body, and thus, NDMA and NDEA are, by definition, active ingredients in a drug.

74.  FDA further requires that whenever a new, active ingredient is added to a drug, then the drug becomes an entirely new drug, necessitating a submission of a New Drug Application by the manufacturer. Absent such an application, followed by a review and approval by the FDA, this new drug remains a distinct, unapproved product.[55]

---

[53] https://www.fda.gov/industry/regulated-products/human-drugs#drug
[54] https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?fr=210.3
[55] See 21 C.F.R. § 310.3(h).

**D.  Defendants Made False Statements in the Labeling of its ICDs**

75. A manufacturer is required to give adequate directions for the use of a pharmaceutical
    drug such that a "layman can use a drug safely and for the purposes for which it is
    intended,"[56] and conform to requirements governing the appearance of the label.[57]

76. "Labeling" encompasses all written, printed or graphic material accompanying the drug
    or device,[58] and therefore broadly encompasses nearly every form of promotional
    activity, including not only "package inserts" but also advertising.

77.  "Most, if not all, labeling is advertising. The term "labeling" is defined in the FDCA as
    including all printed matter accompanying any article. Congress did not, and we cannot,
    exclude from the definition printed matter which constitutes advertising."[59]

78. If a manufacturer labels a drug but omits ingredients, that renders the drug misbranded.[60]

79. Because NDMA and/or NDEA were not disclosed by Defendants as ingredients in the
    ICDs purchased by Plaintiff, the subject drugs were misbranded.

80. It is unlawful to introduce a misbranded drug into interstate commerce.[61] Thus, the ICDs
    purchased by Plaintiff were unlawfully distributed and sold.

**E.  Background on Good Manufacturing Practices ("cGMPs")**

81. In manufacturing, distributing, and selling the contaminated ICDs purchased by Plaintiff,
    Defendants violated the following Current Good Manufacturing Practices.

---

[56] 21 C.F.R. § 201.5
[57] 21 C.F.R. § 801.15
[58] *Id*. 65 Fed. Reg. 14286 (March 16, 2000).
[59] *U.S. v. Research Labs.*, 126 F. 2d 42, 45 (9th Cir. 1942).
[60] 21 C.F.R. §201.6; 201.10.
[61] 21 U.S.C. § 331(a).

82. Under 21 C.F.R. § 200 et seq., current good manufacturing practice ("cGMP") requirements are set forth. The requirements in this part are intended to ensure that drugs will be safe and effective and otherwise in compliance with the FDCA. This part establishes basic requirements applicable to manufacturers of pharmaceutical drugs.

83. 21 C.F.R. § 201.6 states that "[t]he labeling of a drug which contains two or more ingredients may be misleading by reason, among other reasons, of the designation of such drug in such labeling by a name which includes or suggests the name of one or more but not all such ingredients, even though the names of all such ingredients are stated elsewhere in the labeling."

84. Section 201.10 requires that all ingredients (meaning "any substance in the drug, whether added to the formulation as a single substance or in admixture [sic] with other substances") be listed. Failure to reveal the presence of an ingredient when the ingredient is material to the drug renders the drug misbranded.

85. Section 201.56 provides requirements for drug labeling:

> (1) The labeling must contain a summary of the essential scientific information needed for the safe and effective use of the drug.
> (2) The labeling must be accurate and must not be misleading.
> (3) A drug's labeling must be based upon human data, and no claims can be made if there is insufficient evidence of effectiveness.

86. Further, any new labels submitted to the FDA must contain all information outlined in the regulation. This includes providing adequate warnings about serious and frequently occurring adverse reactions. This also may include providing a boxed warning for adverse reactions that may lead to death or serious injury. Clinically significant adverse reactions should also be listed in the Warnings and Precautions section of the label. The

label must also provide information about whether long term studies in animals have been performed to evaluate carcinogenic potential.

87. Section 202.1 covers prescription-drug advertisements and requires that the ingredients of the drug appear in ads. Ads must also contain true statements of information relating to side effects.

88. Parts 211, 225, and 266 "contain the minimum current good manufacturing practices for the methods used in, and the facilities or controls to be used for, the manufacture, processing, packaging, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that is purports or is represented to possess." 21 C.F.R. 210.1(a). Failure to comply with any of these regulations renders a drug adulterated. 21 C.F.R. 210.1(b).

89. Section 210.3(7) defines an active ingredient in a drug: "Active ingredient means any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of man or other animals. The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect."

90. Section 211.22 requires that a quality control unit be charged with ensuring quality requirements are met and the personnel are adequately trained.

91. Sections 211.42-58 require that facilities be kept in good repair, that adequate lighting, ventilation, and temperature conditions be maintained.

92. Sections 211.100-211.115 require manufacturers to have written procedures for production and process control to ensure consistency and quality. These procedures should also require thorough documentation of any deviations from these procedures.

93. Section 211.160 require that manufacturers maintain written standards, sampling plans, test procedures, or other laboratory control mechanisms, including sampling procedures and plans, and that those standards be reviewed by a quality control unit. All deviations from these procedures should be documented.

94. Sections 211.165, 211.166, and 211.170 require that appropriate sampling and stability testing be done, and that samples be retained for testing.

95. Sections 211.180-211.198 require written records of maintenance, laboratory records, distribution records, complaint files, among other things.

**F.  The Generic Drug Approval Framework**

96. The Drug Price Competition and Patent Term Restoration Act of 1984 – more commonly referred to as the Hatch-Waxman Act – is codified at 21 U.S.C. § 355(j).

97. The stated purpose of Hatch-Waxman is to strike a balance between rewarding genuine innovation and drug discovery by affording longer periods of brand drug marketing exclusivity while at the same time encouraging generic patent challenges and streamlining generic drug competition so that consumers gain the benefit of generic drugs at lower prices as quickly as possible.

98. Brand drug companies submitting a New Drug Application ("NDA") are required to demonstrate clinical safety and efficacy through well-designed clinical trials. 21 U.S.C. § 355 et seq.

99. By contrast, generic drug companies submit an ANDA. Instead of demonstrating clinical safety and efficacy, generic drug companies need only demonstrate bioequivalence to the brand or reference listed drug. Bioequivalence is the "absence of significant difference" in the pharmacokinetic profiles of two pharmaceutical products. 21 C.F.R. § 320.1(e).

## 1. ANDA Applications Must Demonstrate Bioequivalence

100.       The bioequivalence basis for ANDA approval is premised on the generally accepted proposition that equivalence of pharmacokinetic profiles of two drug products is evidence of therapeutic equivalence. In other words, if (1) the RLD is proven to be safe and effective for the approved indication through well-designed clinical studies accepted by the FDA, and (2) the generic company has shown that its ANDA product is bioequivalent to the RLD, then (3) the generic ANDA product must be safe and effective for the same approved indication as the RLD.

101.       As part of its showing of bioequivalence pursuant to 21 C.F.R. § 314.50(d), the ANDA must also contain specific information establishing the drug's stability, including: a full description of the drug's substance, including its physical and chemical characteristics and stability; and the specifications necessary to ensure the identify strength, quality and purity of the drug substance and the bioavailability of the drug products made from the substance, including, for example, tests, analytical procedures, and acceptance criteria relating to stability.

102.       Generic drug manufacturers have an ongoing federal duty of sameness in their products. Under 21 U.S.C. § 355(j), the generic manufacturer must show the following things as relevant to this case: the active ingredient(s) are the same as the RLD, § 355(j)(2)(A)(ii); and, that the generic drug is "bioequivalent" to the RLD and "can be

expected to have the same therapeutic effect," *Id.* at (A)(iv). A generic manufacturer (like

a brand manufacturer) must also make "a full statement of the composition of such drug"

to the FDA. Id. at (A)(vi); see also § 355(b)(1)(C).

103.    A generic manufacturer must also submit information to show that the "labeling

proposed for the new drug is the same as the labeling approved for the [RLD][.]" 21

U.S.C. § 355(j)(2)(A)(v).

### 2. ANDA Applications Must Provide Information About the Manufacturing Plants and Processes

104.    The ANDA application must also include information about the manufacturing

facilities of the product, including the name and full address of the facilities, contact

information for an agent of the facilities, and the function and responsibility of the

facilities.

105.    The ANDA application must include a description of the manufacturing process

and facility and the manufacturing process flow chart showing that there are adequate

controls to ensure the reliability of the process.

106.    Furthermore, the ANDA application must contain information pertaining to the

manufacturing facility's validation process, which ensures that the manufacturing process

produces a dosage that meets product specifications.

### 3. ANDA Applications Must Comply with cGMPs

107.    Additionally, ANDA applications must include certain representations pertaining

to compliance with cGMPs.

108.     The ANDA application is required to contain cGMP certifications for both the

ANDA applicant itself, and also and the drug product manufacturer (if they are different

entities).

### 4. ANDA Approval is Contingent upon Continuing Compliance with ANDA Representations of Sameness

109.     Upon granting final approval for a generic drug, the FDA will typically state that

the generic drug is "therapeutically equivalent" to the branded drug. The FDA codes

generic drugs as "A/B rated" to the RLD branded drug. [62]  Pharmacists, physicians, and

patients can expect such generic drugs to be therapeutically interchangeable with the

RLD, and generic manufacturers expressly warrant as much through the inclusion of the

same labeling as the RLD delivered to consumers in each prescription of its generic

products. Further, by simply marketing generic drugs pursuant to the brand-name drug's

label under the generic name (e.g., irbesartan), The FDA's Drug Glossary defines an

RLD as follows: "A Reference Listed Drug (RLD) is an approved drug product to which

new generic versions are compared to show that they are bioequivalent. A drug company

seeking approval to market a generic equivalent must refer to the Reference Listed Drug

in its Abbreviated New Drug Application (ANDA). [63] By designating a single reference

listed drug as the standard to which all generic versions must be shown to be

bioequivalent, FDA hopes to avoid possible significant variations among generic drugs

and their brand name counterpart." Generic manufacturers warrant that the generic drug

is therapeutically equivalent to the brand-name drug.

---

[62] https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms#R
[63] *Id.*

110.     If a generic drug manufacturer ceases to manufacture a drug that meets all terms of its ANDA approval, or in other words, when the drug is not the same as its corresponding brand-name drug, then the manufacturer has created an entirely new and unapproved drug.

111.     If a generic drug manufacturer ceases to manufacture a drug that meets all terms of its ANDA approval, or in other words, when the drug is not the same as its corresponding brandname drug, the generic manufacturer may no longer rely on the brand-name drug's labeling.

112.     According to the FDA, there are approximately eighteen ANDAs approved for generic AVAPRO.

**5.  Approval of ANDAs Related to Isbesartan**
**i. AVAPRO Background**

113.     Irbesartan is a potent, orally active nonpeptide tetrazole derivative which causes a reduction in blood pressure, and is used in the treatment of hypertension, heart failure, myocardial infracture, and nephropathy associated with Type-2 adult diabetic patients. Millions of people benefit from the high-quality products that the FDA regulates, and the U.S. has the most robust drug supply in the world.

114.     Irbesartan and its combination therapy are the generic versions of the AVAPRO and AVAPRO HCTZ, which were marketed in tablet form by Sanofi-Aventis with co-developer Bristol Myers Squibb upon approval by the FDA.

115.     These Irbesartan based branded drugs proved to be blockbuster products for Sanofi-Aventis and Bristol Myers Squibb. Globally, AVAPRO and AVAPRO HCTZ generated $1.98 million in sales in 2011 according to Sanofi Form 20-F for that year, of which $411,815.14 was from the United States.

116.     AVAPRO's, AVAPRO's HCT's, and APROVASC's FDA approved labels
specify the active and inactive ingredients. None of the contaminants at issue here
(including NDMA, NDEA, or other nitrosamines) are FDA-approved ingredients of
AVAPRO, AVAPRO HCTZ, or APROVASC. Nor are any of these contaminants FDA
approved ingredients of any generic irbesartan-containing product approved pursuant to
an ANDA.

**ii. ANDA Applications for Generic Irbesartan**

117.     On September 30, 1997, Irbesartan was discovered by Sanofi Aventis US, co-
developed by Sanofi-Aventis and Bristol Myers Squibb and was launched overseas (the
generic equivalent of the AVAPRO product).

118.     On April 4, 2012, Teva as the first company to file ANDA containing paragraph
IV certifications for both Irbesartan and Irbesartan- Hydrochlorothiazide. Teva
announced the launch of the ANDA application for Irbesartan and Irbesartan-
Hydrochlorothiazide  (the generic equivalent of the AVAPRO and AVALIDE product),
for which it received tentative approval on April 4, 2012.

119.     On September 12, 2012, Mylan Pharmaceuticals Inc. received final approval from
the FDA for its ANDA application for Irbesartan and Irbesartan-Hydrochlorothiazide.

120.     Shortly thereafter, on September 27, 2012, Princeton Inc. received final approval
from the FDA for its ANDA application for Irbesartan.

121.     Upon information and belief, in the intervening years after these three initial
ANDA applications, all other Defendants filed ANDA applications for either Irbesartan
(the generic equivalent of the AVAPRO product), Irbesartan-Hydrochlorothiazide (the

generic equivalent of the AVAPRO and AVALIDE product) and Irbesartan-Amlodipine (the generic equivalent of the APROVASC product).

122.     Despite the number of ANDAs that had been filed since the discovery of Irbesartan in 1997, and when AVAPRO patent expired in 2011, no generic entered the market untill 2012.

123.     Mylan and Teva were among those who had tentative approval and were ready to launch their generic AVAPRO Product upon expiration of the AVAPRO patent in 2011. The entry of the rest of the generic equivalents of these drugs followed thereafter.

**G. Defendants' Violations of cGMPs in their Foreign Manufacturing Facilities**

124.     For some time, Defendants have known that generic drugs manufactured overseas, particularly in China and India, were found or suspected to be less safe and effective than their branded equivalents or domestically made generics due to their grossly inadequate manufacturing processes, procedures and compliance with Current Good Manufacturing Practices ("cGMPs").

125.     ZHP has Active Pharmaceutical Ingredient ("API") manufacturing facilities located in Linhai City, Zhejiang Province, China. According to ZHP's website, ZHP was one of the first Chinese companies approved to sell generic drugs in the United States, and it remains one of China's largest exporters of pharmaceuticals to the United States and the European Union.

126.     ZHP serves as a contract API manufacturer of numerous Defendants' ICDs as set forth *supra,* and Defendants thus have a quality assurance obligation with respect to ZHP's processes and finished products as set forth above pursuant to federal law.

127.     ZHP has a history of deviations from FDA's cGMP standards that began almost

as soon as ZHP was approved to export pharmaceuticals to the United States.

**H. Defendants' Warranties and Fraudulent and Deceptive Statements to Consumers Regarding Their Generic ICDs**

128.      Each Defendant made and breached express warranties and also made affirmative

misrepresentations and omissions to consumers about their contaminated, adulterated,

and/or misbranded ICDs.

129.     The FDA maintains a list of "Approved Drug Products with Therapeutic

Equivalence Evaluations" commonly referred to as the Orange Book.[64] The Orange Book

is a public document; Defendants sought and received the inclusion of their ICD products

in the Orange Book upon approval of their ANDAs. In securing FDA approval to market

generic ICDs in the United States as an Orange Book-listed drug, Defendants were

required to demonstrate that their generic ICDs was bioequivalent to their RLDs.

130.     Therapeutic equivalence for purposes of generic substitution is a continuing

obligation on the part of the manufacturer. For example, according to the FDA's Orange

Book, therapeutic equivalence depends in part on the manufacturer's continued

compliance with cGMPs.

131.     Each Defendant's ICD(s) is/are accompanied by an FDA-approved label. By

presenting consumers with an FDA-approved ICD label, Defendants, as generic

manufacturers, made representations and express warranties to consumers of the

"sameness" of their products to the ICD's RLD, and that their products were consistent

---

[64] https://www.fda.gov/drugs/resources-information-approved-drugs/approved-drug-products-therapeuticequivalence-evaluations-orange-book

with the safety, quality, purity, identity, and strength characteristics reflected in the FDA-approved labels and/or were not contaminated, adulterated, and/or misbranded.

132.     By introducing their respective ICDs into the United States market as a therapeutic equivalent to their RLDs and with the FDA-approved label that is the same as that of the RLDs, Defendants represent and warrant to end users that their ICDs are in fact the same as and are therapeutically interchangeable with their RLDs. Much of the generic drugs supply chain, including the most critical components of that supply chain (end-user patients) rely on these representations and warranties.

133.     In addition, each Defendant affirmatively misrepresented and warranted to consumers through their websites, brochures, and other marketing or informational materials that their ICDs complied with cGMPs and did not contain (or were not likely to contain) any ingredients besides those identified on the products' FDA-approved labels.

134.     The presence of contaminants in Defendants' ICDs: (1) renders Defendants' ICDs non-bioequivalent (i.e., not the same) to their RLDs and thus non-therapeutically interchangeable with them, thus breaching Defendants' express warranties of sameness; (2) was the result of gross deviations from cGMPs rendering Defendants' ICDs non-therapeutically equivalent to their RLDs, thus breaching Defendants' express warranties of sameness; and (3) results in Defendants' ICDs containing an ingredient that is not also contained in their RLDs, also breaching Defendants' express warranty of sameness (and express warranty that the products contained the ingredients listed on each Defendant's FDA-approved label). Each Defendant willfully, recklessly, or negligently failed to ensure their ICDs' labels and other advertising or marketing statements accurately conveyed information about their products.

135.     The presence of nitrosamines in Defendants' ICDs and Defendants' serial and willful failures to comply with cGMPs and other shortcomings in Defendants' generic drug manufacturing processes have resulted in Defendants' ICDs being misbranded and adulterated compared to Defendants' representations and warranties.

136.     Naturally, due to their status as probable human carcinogens as listed by both the IARC and the U.S. EPA, NDMA and NDEA are not FDA-approved ingredients in ICDs. The presence of NDMA and other similar nitrosamines or impurities in Defendants' ICDs means that Defendants have violated warranties to Plaintiff and the respective putative classes.

137.     For these and other reasons, Defendants' ICDs are therefore adulterated, misbranded, and/or unapproved, and it was illegal for Defendants' to have introduced such ICDs in the United States. See 21 U.S.C. §§ 331(a), 351(a)(2)(B), 331(g).

138.     Adulterated, misbranded, and/or unapproved ICDs contaminated with cancer and/or disease- causing compounds are essentially worthless. No consumer (including Plaintiff) would purchase (or reimburse for) these contaminated ICDs. In fact, an adulterated, misbranded, and/or unapproved ICD cannot even be legally sold or purchased within the United States. This is especially so given that alternative, actual ICDs or competing medications with the same approved indications were available from other manufacturers. At a minimum, adulterated, misbranded and/or unapproved ICDs do not possess the same safety and efficacy profile as their branded equivalents. As such, the contaminated ICDs were not what they were supposed to be.

139.     The recalls were meant to quickly remove unsafe products from the market. While FDA advised patients to continue taking ICDs, it only did so as an interim measure

because of a potential shortage of the medication and the risks associated with untreated high blood pressure.

140.      In response to the recall, pharmacies and health care providers throughout the United States contacted affected patients to advise them of the recall and to recommend that they contact their doctors to request a replacement or an alternative treatment option.

141.      Because of the seriousness of the impurity—unsafe levels of a carcinogen— all or virtually all patients immediately stopped taking the tainted drug products after receiving notice of the recall. They were prescribed a safe alternative. ICDs had no use and were discarded.

**1. ZHP Defendants' Warranties**

142.      On its January 29, 2019 website,[65] ZHP stated that it "has established an independent, strict and sound quality mangement [sic] system in accordance with GMP." ZHP further claims that it "ensure[s] that production is operated in accordance with GMP and product quality meets the required specifications," and that ZHP's "workshops of formulation are designed in strict compliance with the international cGMP standard, where the most advanced automatic pharmaceutical production equipment in the world was introduced."

143.      Huahai US assisted Prinston in obtaining approval of its ANDA for its ICDs.

144.      Prinston lists its Irbesartan as equivalent to Avapro on its website.[66]

145.      Furthermore, Solco states "Our products are manufactured in state-of-the-art GMP facilities using the highest quality assurance standards that meet the FDA regulatory requirements."[67, 68, 69]

---

[65] ZHP completely changed its website sometime in February or March 2019.
[66] https://www.solcohealthcare.com/product/irbesartan/

### 2. Teva Defendants' Warranties

146.     Teva has a "Generics FAQs" on its website.[70] In response to the question "Are

generic drugs safe?" Teva states the following:

> A generic drug is bioequivalent to the original innovative drug and
> meets the same quality standards. The active ingredient, the
> content, the dosage form and the usage of a generic drug are
> similar to those of an innovative drug. Generic drugs are
> essentially the same as the original drug, but are offered at a lower
> price.

147.      In response to the question "How do you ensure generic drug safety, having tried

it in only a limited number of patients?" Teva states the following:

> The generic product's active pharmaceutical ingredient (API) is
> identical to that of the innovative drug, its purity profile is similar
> and it is found to be bioequivalent; therefore its safety and efficacy
> are also comparable.

148.     Similarly, under the webpage titled "Uncompromising Quality," Teva states that it

knows that its products affect patient health.[71] Teva further states that it "guarantee[s] the

quality of our products" with through Teva's "impeccable adherence to … [cGMPs][.]"

149.     Teva's website states that "Our state-of-the-art manufacturing facilities feature the

most advanced testing equipment to guarantee the quality of our products. Equipment is

tested and certified, and every manufacturing process is validated. All supplier

---

[67] http://www.prinstonpharm.com/col.jsp?id=113
[68] Upon information and belief, Solco's website formerly represented "on the "About Solco" page of its website that "[b]y using the same active ingredients, [Solco] produce[s] products which are identical (equivalent) to the branded medication." http://solcohealthcare.com/about-solco.html
[69] Upon information and belief, Solco's website formerly represented on the "Drug Safety" page of its website, Solco states that "Solco Healthcare is committed in providing … its patients with high quality, FDA-approved generic medications."http://solcohealthcare.com/trade-partner-information.html#DrugSafety
[70] https://www.tevapharm.com/our_products/generic_qa/
[71] https://www.tevapharm.com/about/profile/quality_assurance/

procedures are strictly supervised to ensure that only the highest grade materials are used in our products."[72]

150.     According to Teva, "[o]ur manufacturing network is continuously optimized so that our customers can have full confidence in our supply chain. This is enabled by high-volume, technologically-advanced distribution facilities. These facilities allow us to deliver new products swiftly and reliably. We continually review our capabilities and capacity. This ensures that we can consistently deliver best-in-class products. Our customers know that their end-consumers are receiving high-quality healthcare and wellness pharmaceuticals."[73]

151.     Teva USA's Code of Conduct affirms, "To ensure we are in compliance and working in accordance with sound quality principles in our research laboratories, in our clinical trials, and in our manufacturing plants and distribution centers, we adhere to the systems and internal controls for 'Good Operating Practices,' or 'GxP,' including Good Laboratory Practices (GLP), Good Clinical Practices (GCP), Good Manufacturing Practices (GMP) Good Pharmacovigilance Practices (GVP) and Good Distribution Practices (GDP)."[74]

152.     Teva USA maintains a Brand-to-Generic Medication Reference on its website.

153.     Plaintiff, was prescribed, purchased, and ingested ICDs which have been the subject of the ZHP and Teva recalls.

---

[72] *Id.*

[73] *Id.*

[74] https://www.tevapharm.com/files/about/corporate_governance/code_of_conduct/Teva_CodeOf Conduct_12Feb2019_FINAL.pdf

## VI.    PLAINTIFF'S INJURIES

154.    At all times material and relevant hereto, Plaintiff, was prescribed, purchased, and ingested irbesartan.

155.    The irbesartan purchased by Plaintiff was manufactured and/or sold by the above-captioned defendants and was at least in part subject to the recent recalls of irbesartan issued by the United States Food and Drug Administration.

156.    Plaintiff would not have purchased or ingested irbesartan had Plaintiff known of or been fully and adequately informed by Defendants of the true increased risks and serious dangers of taking the drug, which was rendered unreasonably dangerous by the presence of NDMA and/or NDEA.

157.    Plaintiff and his physicians reasonably relied on Defendant's representations and omissions regarding the safety and efficacy of irbesartan.

158.    Plaintiff and his physicians did not know of the specific increased risks and serious dangers, and/or were misled by Defendants, who knew or should have known of the true risks and dangers, but consciously chose not to inform Plaintiff or his physicians of those risks and further chose to actively misrepresent those risks and dangers to Plaintiff and his physicians.

159.    Plaintiff and his physicians chose to take and prescribe irbesartan based on the risks and benefits disclosed to them by Defendants but would have made a difference choice, had the true risks and benefits been provided.

160.    As a direct and proximate result of these Defendants' wrongful conduct and the use of Defendants' defective medications, Plaintiff suffered damages, including the cost of purchasing contaminated medication that he would not have otherwise purchased.

161.     Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interests thereon and costs.

162.     Plaintiff did not know and could not have known through the exercise of reasonable diligence that the irbesartan Plaintiff was prescribed and purchased was contaminated. For this reason, Plaintiff's Complaint was filed within the time period allowed by the applicable statutes of limitations and within the prescriptive period allowed.

163.     Plaintiff herein brings this action within the applicable statutes of limitations. Specifically, Plaintiff brings this action within the prescribed time limits following Plaintiff's injuries and Plaintiff's knowledge of the wrongful cause. Prior to such time, Plaintiff did not know nor had reason to know of Plaintiff's injuries and/or the wrongful cause thereof.

164.     Defendants' failure to document or follow up on the known defects of its products, and processes, and concealment of known defects, serious increased risks, dangers, and complications, constitutes fraudulent concealment that equitably tolls any proffered statute of limitation that may otherwise bar the recovery sought by Plaintiff herein.

165.     Defendants named herein are estopped from relying on any statute of limitations defense because they continued to downplay and deny reports and studies questioning the safety of contaminated irbesartan, actively and intentionally concealed the defects, suppressed reports and adverse information, failed to satisfy FDA and other regulatory and legal requirements, and failed to disclose known dangerous defects and serious increased risks and complications to physicians and Plaintiff.

166.     Defendants performed the above acts, which were and are illegal, to encourage

physicians and patients to prescribe and take irbesartan in its contaminated and

unreasonably dangerous form.

167.     At all relevant times, the Defendants were under a continuing duty to disclose the

true character, quality, and nature of the increased risks and dangers associated with

irbesartan, particularly when the drug ceased to be the same as its brand-name

counterpart.

168.     Defendants furthered their fraudulent concealment through acts and omissions,

including misrepresenting known dangers and/or defects in irbesartan, and a continued

and systematic failure to disclose and/or cover-up such information from/to Plaintiff,

Plaintiff's physicians, and the public.

169.     Defendants' acts and omissions, before, during and/or after the act causing

Plaintiff's injuries, prevented Plaintiff and/or Plaintiff's physicians from discovering the

injury or causes thereof until recently.

170.     Defendants' conduct, because it was purposely committed, was known or should

have been known by them to be dangerous, heedless, reckless, and without regard to the

consequences or the rights and safety of Plaintiff and other patients.

## VII.    GENERAL ALLEGATIONS

171.     Plaintiffs repeat and incorporate by reference all other paragraphs of this

Complaint as if fully set forth herein and further alleges as follows:

172.     At all relevant times, the ICDs purchased by Plaintiff were researched, developed,

manufactured, marketed, promoted, advertised, sold, designed and/or distributed by

Defendants.

173. Defendants negligently, carelessly, and/or recklessly manufactured, marketed, advertised, promoted, sold, designed and/or distributed the ICDs purchased by Plaintiff as safe and effective treatment for Plaintiff's underlying condition.

174. Defendants knew, and/or had reason to know, that the ICDs purchased by Plaintiff were defective, unreasonably dangerous, and not safe for the purposes and uses that these Defendants intended.

175. Defendants knew, and/or had reason to know, that the ICDs ingested by Plaintiff were defective, unreasonably dangerous and not safe for human consumption, as they contained dangerously high levels of carcinogenic compounds, namely NDMA and NDEA.

176. At all relevant times, the Defendants named herein were acting as manufacturers of the ICDs ingested by Plaintiff.

177. Defendants promoted the ICDs purchased by Plaintiff for treatment of high blood pressure and other indications.

178. Defendants misrepresented, downplayed, and/or omitted the safety risks of the ICDs purchased by Plaintiff to physicians and patients, including Plaintiff and his physicians by failing to disclose the presence of NDMA and/or NDEA in their products and by failing to disclose the side effects associated with ingesting these compounds at dangerously high levels.

179. Defendants willfully and/or intentionally failed to warn and/or alert physicians and patients, including Plaintiff and his physicians, of the increased risks and significant dangers resulting from the FDA-unapproved use of the ICDs ingested by Plaintiff which contained carcinogenic compounds.

180.     Defendants knew and/or had reason to know, that their representations and

suggestions to physicians that their ICDs were safe and effective for such uses, were

materially false and misleading and that physicians and patients including Plaintiff and

his physicians, would rely on such representations.

181.     Defendants failed to conduct proper testing relating to the unapproved drugs they

manufactured, distributed, marketed, and sold to Plaintiff.

182.     Defendants failed to seek FDA approval for the unapproved drugs they

manufactured, distributed, marketed, and sold to Plaintiff.

183.     Defendants failed to sufficiently conduct post-market surveillance for the

unapproved drugs they manufactured, distributed, marketed, and sold to Plaintiff.

184.     The ongoing scheme described herein could not have been perpetrated over a

substantial period of time, as has occurred here, without knowledge and complicity of

personnel at the highest level of Defendants, including the corporate officers.

185.     Defendants knew and/or had reason to know of the likelihood of serious injuries

caused by the use of the ICDs purchased by Plaintiff, but they concealed this information

and did not warn Plaintiff or his physicians, preventing Plaintiff from making informed

choices in selecting other treatments or therapies.

186.     Defendants knew or should have known that the manufacturing processes

employed to make the ICDs purchased by Plaintiff was unreasonably dangerous, unsafe,

unvalidated, and not properly studied or tested.

187.     Defendants knew or should have known that it is the manufacturer's duty to test

its products to ensure they meet quality and safety standards. Yet, Defendants failed to do

so.

188.    Had Defendants performed adequate tests on the ICDs, these defendants would

have discovered that these drugs were not safe for human consumption.

## VIII.   CLASS ACTION ALLEGATIONS

189.    Plaintiff brings this action pursuant to Fed.R.Civ.P. 23(a) and 23(b)(1), 23(b)(2),

and 23(b)(3) on behalf of itself and all others similarly situated, as members of a National

Class (Counts I – VI) and a Florida Class  (Count VII) defined as follows:

National Class: All consumers, excluding governmental entities and any Defendant or
entity controlled by any Defendant, that paid all or   part of the expense for Irbesartan,
Irbesartan-containing products contaminated with NDMA or NDEA identified by the
FDA's list of NDEA-contaminated Irbesartan released by FDA through the date of trial.

Florida Class: All Florida consumers, excluding governmental entities and any Defendant
or entity controlled by any Defendant, that paid all or          part of the expense for
Irbesartan, Irbesartan-containing products contaminated with NDMA or NDEA identified
by the FDA's list of NDEA-contaminated Irbesartan released by FDA through the date of
trial.

190.    The Classes are so numerous that joinder of all its members is impractical. There

are thousands of consumers in the Classes.

191.    There are questions of law and fact common to the Classes which predominate

over questions affecting only individual members of the Classes, including but not

limited to the following:

     a.   whether NDEA-contaminated Irbesartan were worthless;

     b.   whether consumers paid to replace, Irbesartan discarded because of the recall and

        if so in what amount;

     c.   whether Defendants' conduct constitutes a breach of express warranties;

     d.   whether Defendants' conduct constitutes unjust enrichment;

     e.   whether the Classes are entitled to damages, and if so, the amount of damages.

192.     The claims of the Plaintiff are typical of the claims of the consumer Classes. Like

other consumers, Plaintiff paid for the contaminated drugs.

193.     The representative Plaintiff, by its counsel, will fairly and adequately assert and

protect the interests of all members of the Classes in that said counsel have experience in

prosecuting class actions on behalf of consumers and have specific experience and

knowledge concerning the substantive legal issues likely to arise in this litigation.

194.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

195.     Common issues predominate over individualized issues in this case.

196.     Class certification is appropriate under Fed.R.Civ.P. 23(b)(1)(A) because the

prosecution of separate actions by individual Class members could create a risk of (A)

inconsistent or varying adjudications with respect to individual members of the Classes;

(B) adjudications with respect to individual Class members which would, as a practical

matter, be dispositive of the interests of all members of the Classes, or which would

substantially impede or impair their ability to protect their interests.

## IX.     CLAIMS FOR RELIEF
### COUNT I
### BREACH OF EXPRESS WARRANTY
### (On behalf of Plaintiff and the National Class against all Defendants)

197.     The allegations in paragraphs 1 – 196 of this Complaint are realleged and

incorporated by reference as though fully set forth herein.

198.     Defendants expressly warranted that the ICDs purchased by Plaintiff and the

Class Members was an FDA-approved generic pharmaceutical that is therapeutically

equivalent to and interchangeable with brand Avapro. Defendants expressly warranted

that their products were the same as brand Avapro.

199.     Defendants sold ICDs that they expressly warranted was compliant with cGMPs and was not adulterated.

200.     Defendants' ICD products did not conform to Defendants' express representations and warranties.

201.     When Defendants manufactured, marketed, and sold the ICD, they recognized the purposes for which the products would be used, and expressly warranted the products were the same as brand Avapro.

202.     This affirmative representation became part of the basis of the bargain in the purchases made by Plaintiff and the Class.

203.     Defendants breached their express warranties with respect to the ICD as it was not manufactured in compliance with cGMPs, it was not therapeutically equivalent to brand Avapro, and it was not interchangeable with brand Avapro.

204.     As a direct and proximate result of Defendants' breaches of their express warranties, Plaintiff and the Class have been harmed and injured because (a) they would not have purchased the ICD containing NDEA if they had known that such irbesartan was adulterated by NDEA; (b) the ICD does not have the characteristics, ingredients, uses, or benefits as promised by the Defendants; (c) the ICD has never been tested for human consumption; (d) the ICD has never been tested for efficacy; and (e) the ICD is worthless.

205.     Plaintiff, individually and on behalf of the Class, seeks all available remedies at law and equity deemed just and proper by the Court.

## COUNT II
## VIOLATION OF THE MAGNUSSON-MOSS WARRANTY ACT – 15 U.S.C. § 2301 et seq.
### (On behalf of Plaintiff and the National Class against all Defendants)

206.　　　The allegations in paragraphs 1 – 196 of this Complaint are realleged and incorporated by reference as though fully set forth herein.

207.　　　 This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

208.　　　The contaminated doses of irbesartan are "consumer products" within the meaning of the Magnusson-Moss Warranty Act, 15 U.S.C. § 2301(1).

209.　　　Plaintiff is a "consumer" within the meaning of the Magnuson- Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiff is a consumer because he is a person entitled under applicable state law to enforce against the warrantor the obligations of its express warranties.

210.　　　Defendants were "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

211.　　　15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

212.　　　Defendants breached these warranties, as described in more detail above, and are therefore liable to Plaintiff and the Classes pursuant to 15 U.S.C. § 2310(d)(1).

213.　　　In their capacity as warrantors, Defendants had knowledge of the defects in the batches of irbesartan they manufactured, distributed, and sold, any efforts to limit the warranties in a manner that would exclude coverage of contaminated irbesartan is unconscionable, and any such effort to disclaim, or otherwise limit, liability for contaminated irbesartan is null and void.

214.     Privity is not required here because Plaintiff and the Class members are intended third-party beneficiaries of any contracts between Defendants and their distributors, and specifically, of the warranties. The distributors were not intended to be the ultimate consumers of irbesartan and have no rights under the warranty agreements provided with each container of irbesartan; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the contaminated batches and/or doses of irbesartan are dangerous instrumentalities due to the aforementioned defects and nonconformities. In the alternative, to the extent it is required, it is satisfied.

**COUNT III**
**STRICT LIABILITY**
**(On behalf of Plaintiff and the National Class against all Defendants)**

215.     The allegations in paragraphs 1 – 196 of this Complaint are realleged and incorporated by reference as though fully set forth herein.

216.     The contaminated ICDs were defectively manufactured because it should not have contained NDMA and/or NDEA, the presence of elevated levels of NDMA and/or NDEA violated federal law, and the presence of NDMA and/or NDEA put consumers at an elevated risk of cancer.

217.     The contaminated drug products were expected to and did reach consumers without substantial change or adjustment.

218.     Defendants knew or should have known of manufacturing defect and the risk of serious bodily injury that exceeded the benefits, of which known are known, of contaminating Irbesartan with NDMA or NDEA.

219.     The contaminated ICDs present an unreasonably dangerous risk beyond what the ordinary consumer would reasonably expect.

220.     The contaminated ICDs are inherently dangerous for their intended uses due to manufacturing defects and the presence of NDMA and/or NDEA. Defendants are, therefore, strictly liable.

221.     As a proximate result of the manufacturing defect for which Defendants are responsible, which caused the presence of contaminants in ICDs and the failure to detect the presence of that toxin, Plaintiff and the Class have suffered economic losses.

## COUNT IV
### NEGLIGENCE
**(On behalf of Plaintiff and the National Class against all Defendants)**

222.     The allegations in paragraphs 1 – 196 of this Complaint are realleged and incorporated by reference as though fully set forth herein.

223.     Defendants have a duty not to violate the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, distribution, advertising, preparing for use, and warning of the risks and dangers of Irbesartan.

224.     Each Defendant owed a duty to Plaintiff and the Class to ensure that the ICDs it sold in the United States were not contaminated with NDMA or NDEA, contained only the ingredients stated in the label, were therapeutically equivalent to brand Avapro, and/or complied with cGMPs, and/or was not contaminated or adulterated.

225.     Defendants' acts constitute an adulteration, as defined by the FDA, and constitute a breach of duty subjecting Defendants to civil liability for all damages arising from parallel state law duties, under the theory of negligence per se. Plaintiff disclaims and expressly does not allege that Defendants were obligated to any duty in excess of or that deviates from the requirements imposed by the FDA.

226.     Each Defendant owed a duty of care to Plaintiff because he was a foreseeable, reasonable, and probable user of irbesartan products. Each Defendant knew, or should have known, that its irbesartan product was contaminated with NDMA and/or NDEA, did not contain only the ingredients stated, was not therapeutically equivalent to brand Diovan and/or did not comply with cGMPs, and/or were adulterated, and each was in the best position to uncover and remedy these shortcomings.

227.     Defendants negligently manufactured the irbesartan at issue, causing contamination with NDMA and NDEA, which are carcinogens.

228.     Each Defendant failed to fulfill its duty of care. Each Defendant inadequately conducted or oversaw the manufacture, testing, labeling, distribution, marketing, warnings, disclosures, and sale of the irbesartan at issue. Each Defendant knew that the aforesaid wrongdoing would damage Plaintiff and the Class.

229.     Each Defendant negligently failed to promptly and immediately warn and disclose to Plaintiffs, and the medical and regulatory communities, of the potential and actual contamination with NDMA and/or NDEA as soon as it was discovered, delaying notice of this harmful and potentially fatal toxic exposure to a carcinogen and thus causing continued exposure to the carcinogenic contamination, and delaying necessary testing, examinations, surveillance, and treatment.

230.     Defendants acted with recklessness and willful and wanton disregard for the health of Plaintiff and the Class

231.     Each Defendant's own unreasonable, negligent actions and inactions were taken or not taken with willful and wanton disregard for the health of Plaintiff and the Class and created a foreseeable risk of harm to Plaintiff and the Class.

232.     As a direct and proximate result of Defendants' negligence, which caused the

presence of NDMA and/or NDEA in Irbesartan, and the failure to detect these toxins,

Plaintiff and the Class have suffered economic losses.

**COUNT V**
**NEGLIGENT MISREPRESENTATION**
**(On behalf of Plaintiff and the National Class against all Defendants)**

233.     The allegations in paragraphs 1 – 196 of this Complaint are realleged and

incorporated by reference as though fully set forth herein.

234.     At all relevant times, Defendants were engaged in the business of manufacturing,

marketing, distributing, and selling the ICDs for resale or use, and in fact did sell these

drugs to Plaintiff and the Class.

235.     Specific defects in these products, as specified above in this Complaint, rendered

them defective and unreasonably dangerous.

236.     In the course of marketing these products, the Defendants made untrue

representations of material facts and/or omitted material information to Plaintiff and the

Class.

237.     Plaintiff (including through his physicians) and the Class reasonably relied on

such misrepresentations and/or omissions and were thereby induced to purchase these

products.

238.     Plaintiff (including through his physicians) and the Class would not have

purchased and used these products had they known of the true safety risks related to such

use.

239.     Defendants were negligent in making these untrue misrepresentations and/or omitting material information because Defendants knew, or had reason to know, of the actual, unreasonable dangers and defects in their products.

240.     Plaintiff (including through his physicians)  and the Class were justified in relying, and did rely, on the misrepresentations and omissions about the safety risks related to Defendants' products.

241.     As the direct, producing, proximate and legal result of the Defendants' misrepresentations, Plaintiff and the Class suffered severe harm for the contaminated ICDs they purchased.

242.     Plaintiff and the Class are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

COUNT VI
UNJUST ENRICHMENT
**(On behalf of Plaintiff and the National Class against all Defendants)**

243.     The allegations in paragraphs 1 – 196 of this Complaint are realleged and incorporated by reference as though fully set forth herein.

244.     Plaintiff and the Class paid for contaminated ICDs, thereby conferring a benefit on Defendants. Defendants expected and intended to receive the benefit of those payments. Defendants' profits would have been reduced, but for their wrongful and unlawful conduct.

245.     Defendants have accepted and unjustly retained the benefit of payments by Plaintiff and the Class to the detriment of Plaintiff and the Class. Defendants appreciated and had knowledge of such benefits conferred by Plaintiff.

246.     Defendants' retention of the benefit violates fundamental principles of justice, equity, and good conscience because Defendants were paid for unsafe products that should not have been sold in the United States and had no value.

247.     Defendants have been unjustly enriched, and as a result of their conduct, Plaintiff and the Class have been damaged and Defendants must disgorge their profits from the sale of contaminated ICDs and pay restitution to Plaintiff and the Class in an amount deemed just and proper.

## COUNT VII
## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (On behalf of Plaintiff and the Florida Class against all Defendants)

248.     The allegations in paragraphs 1 – 196 of this Complaint are realleged and incorporated by reference as though fully set forth herein.

249.     Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), codified at sections 501.204, et seq., Fla. Stat., prohibits "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." § 501.204(1), Fla. Stat.

250.     Plaintiff is a consumer within the meaning of section 501.203(7).

251.     Under FDUTPA, "trade or commerce" is defined as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." § 501.203(8), Fla. Stat.

252.     Defendants were and are engaged in "trade or commerce," in which they manufacturer, distribute, and sell prescription drugs or API.

253.     Defendants made false and fraudulent misrepresentations that their ICDs and the irbesartan API were compliant with cGMPs, were bioequivalent to Avapro and could lawfully be sold. Defendants' failure to comply with cGMPs rendered the ICDs adulterated or contaminated, and, accordingly, the distribution and sale of those drugs was and is unlawful. *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B).

254.     Defendants' deceptive and unfair practices were a direct and proximate cause of Plaintiff's and Class Members' damages.

255.     Plaintiff's and the Class Members' damages include, but are not limited to, all payments made for the ICDs.

256.     Defendants benefited from their deceptive and unfair practices by unlawfully receiving payment for adulterated, contaminated ICDs, which could not lawfully be distributed or sold in the U.S.

257.     Under FDUTPA, Plaintiff is entitled to recover twice its actual damages, together with its attorneys' fees and costs. §§ 501.2105, 501.211, Fla Stat.

## PRAYER FOR RELIEF

Plaintiff on behalf of itself and all others similarly situated, pray for relief and judgment in favor of itself and the Classes as follows

   a.     For an order certifying the proposed Classes under the appropriate provisions of Fed.R.Civ.P.23, and appointing Plaintiff and its counsel to represent the Classes and appointing Plaintiff as a representative for the Classes and Plaintiff's undersigned counsel as lead counsel for the Classes;

   b.     For actual, compensatory, and consequential damages;

    c.       For disgorgement of Defendants profits associated with the sale of contaminated ICDs and restitution for Plaintiff's and the Classes' expenses associated with the sale of contaminated ICDs and the costs to them associated with the recall;

    d.       For all relief available under New Jersey's Consumer Fraud Act, including injunctive relief

    e.       For attorneys' fees;

    f.       For pre and post-judgment interest;

    g.       For costs of suit; and

    h.       For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 4, 2019           Respectfully Submitted,

                                  _/s/ *Paul S. Rothstein*_
                                    Paul S. Rothstein
                                    Fl. Bar No. 310123
                                    Attorney for Plaintiff
                                    626 NE 1st Street
                                    Gainesville, Fl. 32601
                                    Ph: 352-376-7650
                                    Fax: 352-374-7133